**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:18-cv-00016-MR-WCM**

| | |
|---|---|
| **RACHEL CARPENTER, as Administratrix of the Estate of PEDRO CRUZ-AMADO,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **MEMORANDUM OF** |
| ) | **DECISION AND ORDER** |
| ) | |
| **WILSON SCOTT TRAMMEL, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Partial Summary Judgment [Doc. 28].

## I.  PROCEDURAL HISTORY

This is an excessive force case arising from a Cleveland County Sheriff's Deputy, Defendant W. Scott Trammel ("Defendant Trammel"), shooting and killing Pedro Cruz-Amado ("Amado") in his front yard on June 21, 2016.  The Plaintiff, Rachel Carpenter, as the Administratrix of the Estate of Pedro Cruz-Amado ("Plaintiff"), brought this action on January 25, 2018. [Doc. 1].  There are twelve claims for relief in the Complaint against the various Defendants in relation to the events surrounding the death of Amado.

In Counts One and Two, the Plaintiff asserts wrongful death claims under N.C. Gen. Stat. § 28A-18-2 against Defendants Cleveland County and Sheriff James A. Norman ("Defendant Norman") in his official capacity. In Counts Three, Four, and Five, the Plaintiff asserts North Carolina common law claims against Defendant Deputy W. Scott Trammel ("Defendant Trammel") in his individual and official capacities for negligence, assault and battery, and for "acts of malice and acts beyond scope of duties."[1] In Count Six, the Plaintiff asserts claims for punitive damages against Defendant Trammel under N.C. Gen. Stat. § 28A-18-2(b)(5) and against Defendant Norman under 42 U.S.C. § 1983. In Counts Seven, Eight, Nine, and Ten, the Plaintiff asserts § 1983 claims against all the Defendants, including claims based on violations of civil rights, unlawful pattern and practice, deliberate indifference, and inadequate training and supervision. In Count Eleven, the Plaintiff asserts an alternative claim under the North Carolina Constitution for substantive due process violations against Defendant Trammel in his official capacity and against Defendants Norman and Cleveland County. In Count Twelve, the Plaintiff asserts an action on the

---

[1] Plaintiff's Count Five, "acts of malice and acts beyond scope of duties" against Defendant Trammel, is not a cause of action, but rather an element of other claims asserted in Counts Three and Four. For this reason, this Count will be dismissed as a separate claim.

Sheriff's bond under N.C. Gen. Stat. § 58-76-5, which the Court considers as a claim against Defendant Liberty Mutual Insurance Company, although it is not identified as such in the Complaint.  [Doc. 1].

On November 30, 2018, the Defendants filed the present Motion for Partial Summary Judgment.  [Doc. 28].  The Court held a hearing on the Defendants' Motion on March 19, 2019.

Having been fully briefed by the parties and heard by the Court, the Defendants' Motion is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "As the Supreme Court has observed, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 814, 115 S.Ct. 68 (1994).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522.  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted).  Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348 (1986).

4

## III. FACTUAL BACKGROUND

The following is a summary of the relevant forecast of evidence, considered in the light most favorable to the Plaintiff, as required by Rule 56 of the Federal Rules of Civil Procedure.

Defendant Trammel became a patrol deputy with the Cleveland County Sheriff's Office in or around August 2014. [Doc. 36-27 at 25]. Defendant Norman has been the duly-elected Sheriff of Cleveland County since 2010. [Doc. 28-1 at ¶ 2].

On June 21, 2016, Defendant Trammel went to Amado's residence in response to a 911 call. The call was made by Amado's sister, at the Plaintiff's request. The Plaintiff was Amado's mother. The Plaintiff directed that the call be made to EMS because the Plaintiff was concerned about Amado's health. The Plaintiff testified that Amado "was crying again and he needed … a doctor." [Doc. 36-22 at 133]. According to the Plaintiff, Amado was depressed and was saying goodbye to everyone. [Id. at 65]. The Plaintiff did not tell Amado that an ambulance had been called. [Id. at 134].

The 911 dispatcher who took the 911 call noted, and the paramedics and Defendant Trammel were therefore advised, that Amado was "saying bye to his family, and they were unsure about weapons." [Doc. 36-23 at 13-14]. In responding to 911 calls involving potentially mentally disturbed

individuals, it is and was the procedure of the Cleveland County EMS to "stage" out of view of the subject residence until officer assistance arrives and secures the scene for the paramedics to safely render care. [Id. at 12-14]. Therefore, after reading the 911 dispatch notes, the paramedics who responded to the 911 call requested that law enforcement be dispatched to secure the scene before the paramedics drove up to the residence. [Doc. 36-23 at 14-15]. Due to a functional error by the GPS system used by the paramedics, the paramedics inadvertently staged the ambulance in view of Amado's residence. [Doc. 36-23 at 17-18, 27-28, 38-40].

The parties dispute certain keys events at Amado's residence that occurred after the arrival and staging of the paramedics. The parties do not dispute, however, that Defendant Trammel was the first officer to arrive at Amado's residence, that an interaction of some sort ensued between Defendant Trammel and Amado in which Amado wielded at least one metal folding chair at Trammel as Trammel approached the residence, and that Defendant Trammel fatally shot Amado only minutes after Defendant Trammel arrived. Amado was 24 years old at the time of his death. [Doc. 36-22 at 9].

On Tuesday, June 14, 2016, exactly one week before the shooting, Amado was admitted to the Crisis Center in Shelby, North Carolina. The

Plaintiff testified that Amado was depressed and drinking too heavily. [Id. at 77-80]. The Crisis Center intake notes state that Amado reported having symptoms of "depression, sadness, crying, insomnia, recent decrease in appetite, feelings of worthlessness, hopelessness, guilt and shame." [Id. at 91]. Amado also reported to the Crisis Center that he was experiencing some suicidal thoughts. [Id. at 92]. Amado attempted twice to escape the Crisis Center, once on Friday, June 17th and once on Saturday, June 18th. [Id. at 104, 106-7, 112]. On the second attempt, Amado reportedly struck a police officer and was brought to the Cleveland County Regional Medical Center on an involuntary commitment order. [Id. at 110-112]. The next day, a Sunday, the hospital released Amado to the local authorities. [Id. at 116]. Later that day, on June 19, 2016, the Plaintiff took Amado home. [Id. at 118-19]. Neither the paramedics nor Defendant Trammel, however, were aware of any of this information when responding to the 911 call.

The undisputed evidence also shows that at the time of the shooting the Sheriff's Office had in place at least two official policies that are potentially relevant to Defendant Trammel's actions on June 21, 2016: (1) Policy 2.01, "Use of Force" ("Use of Force Policy"); and (2) Policy 2.18, "Dealing with the Mentally Ill" ("Mentally Ill Policy"). [Docs. 28-2, 28-3]. The

Use of Force Policy sets forth, among other things, the circumstances under which the use of deadly force is authorized. It provides:

> Deputies are authorized to use deadly force against another person when, under the circumstances then known to the deputy, it reasonably appears necessary in order to defend himself or others from the use or imminent threatened use of deadly force.

[Doc. 28-3 at 3]. The purpose of the Mentally Ill Policy is "to provide guidance to sheriff's employees when dealing with suspected mentally ill persons." [Doc. 28-2 at 2]. It provides:

> A subject may suffer from mental illness if they display an inability to think rationally, exercise adequate control over behavior or impulses (e.g. aggressive, suicidal, homicidal, sexual), and/or take reasonable care of his/her welfare with regard to basic provisions for food, clothing, shelter, and/or safety.

[Doc. 28-2 at 2]. The Mentally Ill Policy includes procedures for recognizing abnormal behavior, determining danger, dealing with the mentally ill, taking custody of an individual with mental illness or making referrals on available community mental health resources. [Doc. 28-2 at 2].

During the approximately 2½ years before the shooting in this case, there were no "citizen-made" or "internally generated" excessive force complaints made against the Cleveland County Sheriff's Office. [Doc. 28-1 at ¶¶ 2, 3]. Also, during the same time period, deputies responded to 2,370

8

calls that reportedly involved "mentally disturbed persons exhibiting abnormal or suicidal behavior." The only such call that resulted in the discharge of a firearm was the call to Amado's residence in this case. [Id. at ¶ 4]. There were no other deputy-involved shootings during this timeframe in Cleveland County. [Id.].

Further, Cleveland County Deputy Sheriff training necessarily includes completion of the basic law enforcement training curriculum approved by either the North Carolina Criminal Justice Education and Training Standards Commission or the North Carolina Sheriff's Education and Training Standards Commission. [Doc. 28-1 at ¶ 4]. Both curricula include instruction on the constitutionally permissible levels of force from both an academic and practical standpoint. [Doc. 28-1 at ¶ 5]. Trammel underwent this training. [Doc. 36-27 at 14-15, 17-18]. Deputies also annually undergo a state-mandated 24-hour block of in-service training, addressing any changes in the laws on arrest, search and seizure, and use of force. [Doc. 28-1 at ¶ 5]. Additionally, Defendant Norman accommodates all possible requests by deputies to attend off-site training classes relevant to their patrol and investigative assignments. To that end, Defendant Trammel successfully completed a 40-hour Crisis Intervention Training (CIT) program through

Cleveland Community College on April 29, 2016, less than two months before the shooting.  [Id. at ¶ 5].

As a general practice, Defendant Norman delegates the day-to-day supervision of deputies working in the field to his chain of command, which includes two majors, three captains, eleven lieutenants, and sixteen sergeants.  [Id. at ¶ 6].  Defendant Norman, nonetheless, monitors matters related to the conduct of his deputies.  His supervisory staff promptly reports any concerns or complaints made against his deputies, whether from civilians or other employees of the Sheriff's Office.  From 2010, when Defendant Norman became Sheriff, to June 20, 2016, "there were no complaints lodged against Deputy Trammel regarding the performance of his duties."  [Id. at ¶ 6].  Defendant Norman also attests as follows:

> As of June 21, 2016[,] there was no policy, custom, or practice within the Cleveland County Sheriff's Office which permitted deputies to violate the constitutional rights of any person, nor have I ever approved of such while Sheriff.  To the contrary, it has been my policy that deputies may use only that amount of force which reasonably appears necessary to take a person into custody or to protect themselves or others from harm or attack.  Force beyond that which is reasonable violates, rather than represents, this policy.

[Id. at ¶ 7].

Defendant Norman and several individuals in his chain of command testified regarding Defendant Trammel's conduct on the day of the shooting, as well as their understanding of the Sheriff's Office policy on excessive force. The other officers who testified include Sergeant James Howell, Patrol Lieutenant William Fredell, and Patrol Captain Richard Acuff. Defendant Norman and his chain of command testified that Defendant Trammel was justified in using deadly force under the circumstances, as they understood them to be, and that his actions did not violate the Sheriff's Office Use of Force Policy. [Doc. 36-38 at 37-38, 76, 128, 131; Doc. 36-29 at 25, 42, 44; Doc. 36-30 at 19, 23, 28, 30; Doc. 36-31 at 18].

## IV. ANALYSIS

### A. Summary Judgment

#### 1. Official Capacity/Governmental Entity Claims

Based on the relevant law and the evidence and arguments at summary judgment, the Court notes that Plaintiff's enumerated § 1983 claims against Defendant Norman in his official capacity and Defendant Cleveland County coalesce in substance into a single § 1983 claim. Namely, Plaintiff contends that Defendant Trammel's failure to act in accordance with Defendant Norman's policies on the use of excessive force and dealing with the mentally ill was a result of a pattern and practice by the Sheriff's Office

of inadequately training on these policies, causing a deprivation of Amado's constitutional rights. For that reason, the Court herein refers to these claims as Plaintiff's "official capacity § 1983 claim."

### a. Official Capacity § 1983 Claim

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. To prevail on a § 1983 claim, the plaintiff has the burden of establishing (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law. Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999). By its terms, § 1983 "creates no substantive rights; it merely provides remedies for deprivation of rights established elsewhere." City of Okla. City v. Tuttle, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432 (1985) (citation omitted).

Local governing bodies, such as Defendant County, "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36 (1978). Further, "although the

touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690-91, 98 S.Ct. at 2036. This second category of Monell liability cases are often referred to as "pattern and practice" or "pattern and custom" cases.

As an initial matter, Defendant Trammel is entitled to summary judgment in his favor for all claims brought against him in his official capacity. These claims are duplicative of the claims against his governmental employer and should be dismissed. Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (affirming district court's dismissal of individual capacity § 1983 claim against Superintendent as essentially a claim against the Board of Education); Wright v. Town of Zebulon, 202 N.C. App. 540, 543-44, 688 S.E.2d 786, 789 (2010) (affirming dismissal of official capacity claims against the mayor, the town manager, the police chief, and other officers as "duplicative" of claims against the municipality). The Court now turns to the

official capacity claims brought against Defendants Norman and Cleveland County.

In order to succeed on her official capacity claims, Plaintiff must not only prove the deprivation of a constitutional right, but also that Defendant County, through the acts of its final decisionmaker regarding law enforcement issues (i.e., Defendant Norman) caused Amado to be subjected to such deprivation. Under Monell, the County may only be held accountable if the deprivation was the result of municipal "custom or policy." Tuttle, 471 U.S. at 817, 105 S.Ct. at 2433. Further, it is said that "the municipal policy must be 'the moving force of the constitutional violation.'" Id. (citing Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454 (1981)). Proof of a single incident of unconstitutional activity, however, is not sufficient to impose liability under Monell, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Tuttle, 471 U.S. at 823-24, 105 S.Ct. at 2436.

Here, the Plaintiff contends "that policies or customs of Defendants Cleveland County and its Sheriff inflicted Plaintiff's injuries, and therefore 'the governmental entity is responsible under § 1983." [Doc. 36 at 6 (citing Monell, 436 U.S. at 691)]. The "policies or customs" on which Plaintiff relies

are not official written policies of the Sheriff's Office, but rather a "policy" of insufficient training and supervision relative to the Sheriff's Use of Force and Mentally Ill Policies. The Plaintiff takes the position that the policy of insufficient training and supervision has resulted in a disparity between these official written policies and the *actual* policies as practiced by the Sheriff's deputies. As such, the Plaintiff's theory of liability under Monell rests on the contention that Trammel acted in accordance with the *actual* (unconstitutional) policies on the use of force and dealing with the mentally ill on the day of shooting where such *actual* policies resulted from insufficient training and supervision by Defendants Norman and the County relative to the official policies.[2]

In order to withstand summary judgment here, the Plaintiff must prove more than a single incident of unconstitutional activity, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Tuttle, 471 U.S. at 823-24, 105 S.Ct. at 2436. The Plaintiff has not forecast evidence from which a jury could find an existing, unconstitutional policy.

---

[2] At the summary judgment hearing in this matter, Plaintiff's counsel asserted several times that "this is not a pattern and practice case." Nonetheless, the substance of the Plaintiff's argument regarding the municipal Defendants is that the pattern or practice of the Sheriff's Department manifests a *de facto* policy that resulted in the denial of the decedent's rights.

Plaintiff's "proof" of an unconstitutional "custom and practice" paradoxically rests on the testimony of Defendant Norman and members of his chain of command that Defendant Trammel did *not* use excessive force with Amado and that he acted in accordance with the Sheriff's official Use of Force Policy. In making this argument, the Plaintiff begins with an opposite conclusion. She contends that because Defendant Trammel, in fact, used excessive force and because his chain of command believed that Trammel acted in accordance with the Sheriff's Use of Force Policy, the deputies must necessarily be inadequately trained on the letter and substance of the Policy. The Plaintiff therefore asserts that a jury could find that there is a custom and practice of inadequate training regarding the official Policies. The Plaintiff's second premise, however, is based on an assumption that is directly contrary to the Plaintiff's conclusion. Therefore, this reasoning is fallacious.

Moreover, the evidence does not support this argument. There were no citizen-made or internally generated use of force complaints against any Cleveland County Sheriff's deputies during the two and a half years prior to the shooting.[3] Without evidence of a single other incident involving the use of excessive force by a Sheriff's deputy, no reasonable juror could conclude

_____

[3] There is nothing in the record regarding the number of complaints, if any, at any time before January 2014.

that the Cleveland County Sheriff's Office operated with the custom and practice of failing to adequately train its deputies on the use of force. See Tuttle, 471 U.S. at 823-24. And there is certainly no forecast of evidence that such failure caused any deprivation of Amado's constitutional rights.

The Plaintiff contends that Defendant Trammel violated the Sheriff's official policy on dealing with the mentally ill by failing to give the situation at Amado's residence "the benefit of time." At the summary judgment hearing, however, the Plaintiff conceded that the only evidence she has shown of inadequate training relative to the Mentally Ill Policy was Trammel's conduct on the day of the shooting. Defendant Trammel's alleged failure to give the situation "the benefit of time" on this single occasion, however, is simply not enough to establish a "custom and practice" that a reasonable jury could find to have overridden the Sheriff's written policy on dealing with the mentally ill. See Tuttle, 471 U.S. at 823-24.

As such, the Plaintiff has failed to forecast sufficient evidence of a custom or practice upon which Monell liability could be based. The Court will, therefore, grant summary judgment for Defendants on Plaintiff's official capacity and governmental entity claims under § 1983.

### b. State law wrongful death claims

The Plaintiff asserts claims against Defendant Cleveland County and Defendant Norman in his official capacity for wrongful death under N.C. Gen. Stat. § 28A-18-2. In an action under N.C. Gen. Stat. § 28A-12-2, a plaintiff must prove (1) a wrongful act resulting in death, (2) causation, and (3) damages. Bailey v. Gitt, 135 N.C. App. 119, 120, 518 S.E.2d 794, 795 (1999). The Plaintiff's wrongful death claims against these Defendants are based on the same allegations that formed the basis of Plaintiff's § 1983 claims. As outlined above, the Plaintiff has necessarily failed to present a forecast of evidence that any "wrongful act" by Defendants caused Amado's death. The Court will, therefore, grant these Defendants' summary judgment motion on Plaintiff's wrongful death claims against them.

### 2. Individual Capacity Claims Against Defendant Norman

Plaintiff asserts claims against Defendant Norman under § 1983 for supervisory liability and punitive damages, contending that Defendant Norman inadequately trained his deputies, including Defendant Trammel, on the use of excessive force and on dealing with the mentally ill.[4]

---

[4] In Plaintiff's brief [Doc. 36 at 1] and at the hearing on the motion for summary judgment, Plaintiff argued that she had asserted an individual capacity claim against Defendant Norman under State law in negligence/gross negligence. Such a claim, however, is not set forth in the pleadings in this matter. [See Doc. 1 at ¶¶ 57-69]. However, even if Plaintiff had asserted such a claim against Defendant Norman, it would fail at summary judgment. Public officials, like Defendant Norman, are "immune from personal liability for

Under § 1983, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). In these cases, however, liability is not premised on *respondeat superior* but on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. (quoting Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1413 (1985)). Liability is ultimately determined "by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." Id. (quoting Slakan, 737 F.2d at 376).

There are three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive

---

mere negligence in the performance of [their] duties." Jones v. Kearns, 120 N.C. App. 301, 305, 462 S.E.2d 245, 247 (1995). Though public officials are not shielded from liability when their "actions were corrupt or malicious or if [they] acted outside and beyond the scope of [their] duties," id., the Plaintiff has not presented a forecast of evidence of corruption or malice by Defendant Norman.

practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. <u>Shaw</u>, 13 F.3d at 799 (citations omitted).

To satisfy the first element, a plaintiff must show: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. <u>Id.</u> (citing <u>Slakan</u>, 737 F.2d at 373). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." <u>Id.</u> (citing <u>Slakan</u>, 737 F.2d at 373-74).

Here, the Plaintiff has failed to produce a forecast of evidence sufficient to satisfy even the first element of her supervisory liability § 1983 claim against Defendant Norman. Plaintiff adduced no evidence that Defendant Norman knew or should have known of any conduct engaged in by Trammel that "posed a pervasive and unreasonable risk of constitutional injury" to the Plaintiff. <u>Shaw</u>, 13 F.3d at 799. Further, there was simply no evidence forecasted to show any such previous conduct by Trammel. The evidence forecasted by the Defendants shows that Norman monitored the conduct of his deputies and that there were no complaints regarding Defendant

Trammel's performance of his duties from the beginning of Defendant Norman's tenure as Sheriff to the day of the shooting.

Because Plaintiff failed to present evidence supporting the first element of a claim for supervisory liability, Defendant Norman is entitled to summary judgment on this claim. Further, Plaintiff cannot recover punitive damages against Defendant Norman in his individual capacity under § 1983 without establishing liability thereunder in the first instance. The Plaintiff's "claim" for punitive damages is, therefore, also dismissed.


## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Partial Summary Judgment [Doc. 28] is **GRANTED**, and the following claims are **DISMISSED WITH PREJUDICE**:

    (1)    All claims against Defendant Trammel in his official capacity;

    (2)    The claim asserted in Count Five against Defendant Trammel in his individual capacity;

    (3)    All claims – state and federal – against Defendant Norman in his individual capacity;

    (4)    The state law claim asserted in Count Two against Defendant Norman in his official capacity;

(5) All federal claims against Defendant Norman in his official capacity; and

(6) All claims asserted against Defendant Cleveland County.

Only the Plaintiff's claims against Defendant Trammel in his individual capacity (except Count 5) and the Plaintiff's action on the Sheriff's bond (Count Twelve) remain for resolution at trial. As to all other claims, the Motion for Partial Summary Judgment [Doc. 28] is **GRANTED**.

**IT IS SO ORDERED.**

Signed: May 13, 2019

Martin Reidinger
United States District Judge